IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

Michael G. Drury,

        Plaintiff,

        vs.                Case No. 13-2282-JTM

BNSF Railway Company.,

        Defendant.

MEMORANDUM AND ORDER

Plaintiff Michael Drury was employed by BNSF Railway until 2012 when he was fired. In the present action, Drury alleges, among other things, that BNSF terminated his employment because of his Native American ancestry, and in retaliation for his reporting discriminatory conduct by a supervisor in 2007. BNSF has moved for summary judgment on Drury's claims,[1] and the court grants the defendant's motion for the reasons set forth in this Order.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary

---

[1] BNSF seeks dismissal of Drury's various claims, including age discrimination, discrimination based or race or national origin, gender discrimination, discharge in violation of public policy, unlawful retaliation, and discriminatory failure to hire. In his Response, Drury concedes that the age and gender discrimination claims should be dismissed. He also presents no defense of his failure-to-hire claims as a separate basis for relief. Accordingly, the present Order discusses in detail only the remaining claims.

judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

### *Findings of Fact and Conclusions of Law*

Drury was born in January, 1959. He describes himself as Native American as to race and as Seminole as to national origin, although he concedes that such status is not apparent from his physical appearance. He agrees that another person would know of his race and national origin only if they were told of it. In fact, Drury, who had been adopted, did not discover his own heritage until he was 21 years old.

BNSF hired plaintiff in August 1996 as a "scheduled," or hourly, employee, working as an assistant signalman, and he held a variety of different positions within the signal department until 2001. Drury was promoted to Signalman, then to Signal Maintainer, then to Retarder Yard Specialist (Signal Electronic Technician).

It is uncontroverted that, over the ten years after starting with BNSF, Drury received a series of promotions, regular raises, bonuses and excellent performance reviews. There were no disciplinary write ups, performance plans or any other black marks of any sort on his performance record during that time period.

In June 2001, Drury applied for and received an exempt management position as a supervisor within the signal department, and in 2005, he moved to a job as a manager of special projects, also within signal.

In April 2006, when he was 47 years old, BNSF promoted Drury to senior manager of signal training at BNSF's Technical Training Center (TTC) at Johnson County Community College. The TTC gives mandatory and optional railroad-related training for employees and other individuals. At the beginning of his TTC assignment, Drury reported to Jeffrey Abbott, the general director of the TTC.

The parties dispute whether decision-makers at BNSF knew of Drury's heritage. BNSF stresses that the key decision makers in Drury's 2012 termination directly aver they were unaware of this heritage.

However, Drury points out that Scott Schafer — his supervisor at TTC, the position he was in immediately prior to his transfer to BNSF's Signal Division — testified that Drury's prior complaint about discrimination on the grounds of his ancestry was "common knowledge" at BNSF.

Drury states that he stays abreast of local Native American Indian events (pow wows) and attends as he can. He belongs to several affinity groups, in order to maintain contact with those in the American Indian community. During his work at BNSF, Drury

3

had a high profile during his years working at BNSF as a representative of Native American Indian interests among employees and potential employees of the BNSF.

For example, from his hiring and for several years thereafter, Plaintiff worked at the Argentine Rail Yard in Kansas City, Kansas. Chuck Gerstner was the manager of signal and Plaintiff's second level supervisor for a time after Drury was hired. Drury avers that it was well known to most all of the employees at the yard that he was American Indian since he talked about it on numerous occasions during conversations.

Drury also states he was involved in the Council of Native Americans, the American Indian affinity group of employees within BNSF, and was asked to serve as a speaker and representative for the group. Schafer sent Drury as his representative to speak to the Choctaw Nation about railroad employment opportunities.

It is uncontroverted that Drury was asked to be the Secretary of the BNSF Council of Native Americans, but Schafer told him he could not accept, due to the time and resource commitments it would have required in Fort Worth, Texas.

Plaintiff also worked to get more American Indian participation in the NARS (National Academy of Railroad Science) training program at the TTC as well. His goal was to increase American Indian representation on the BNSF and to help dispel BNSF prejudices that Native Americans were lazy and useless.

Drury states that he worked to dispel bias and prejudice against Native Americans whenever he encountered it at BNSF.

Drury states in his affidavit that he explained to Golder that he was American Indian and that he believed the issues involved cultural misperceptions and it was not a work ethic issue. Drury had heard the same type of disparaging stories about the American Indian work gangs before and made the same argument numerous times over his years at the BNSF.

BNSF claims that this affidavit statement directly contradicts Drury's deposition testimony.

> Q.  Did you disclose to Mr. Golder about your race and national origin being Native American and Seminole?
>
> A.  No. But once again, he would have had an opportunity to look at that on my profile.
>
> Q.  Did you ever hear Mr. Golder make any comments to indicate that he had any animus toward Native Americans or Seminole?
>
> A.  Not that I can recall, no, not right now.

Drury identified his Native American/Seminole race and national origin on his public employee officer profile at BNSF that was available for any of his supervisors to view. He states that anyone at BNSF who communicated with him by email would have seen that he subscribed to an American Indian affinity email group.

Drury avers that he frequently discussed his race and national origin with his co-workers, supervisors and managers over the years. Specifically, he states that spoke or wrote about his Native American race and Seminole national origin, his personal membership in various American Indian groups and causes to various BNSF managers, including Jeffrey Abbott, Scott Schafer, Lynne Joplin, Mark Schulze, Steve Klug, Carl Ice, John Shook, Calvin Hobbs, Dwight Golder, Chuck Gerstner, Ralph Young and Jim LeVere.

Drury knew when he began his exempt employment that BNSF had written policies that prohibited discrimination and harassment on the basis of race, national origin, sex and age, as well as retaliation against employees for exercising rights protected by the policies. He knew he could report concerns about discrimination to the human resources department, and by 2007 or 2008 he also knew BNSF had a hotline for such concerns.

In late 2006 or early 2007, Drury (then 48 years old) raised allegations of age discrimination and retaliation against Abbott. Drury complained directly to Abbott, and also to other management officials, including assistant vice presidents of signal and training and human resources, and BNSF's chief operating officer.

These events arose after Drury had been in TTC only a few months. In introducing Drury around the TTC, Abbott identified two workers as "old raisins" who were "bitter" about changes in the department. Drury claimed that Abbott told him he "was supposed to go after one of [his] employees and find something to fire him for because he was old and [Abbott] wanted him out." Further, according to Drury, at one time in 2007 Abbot had asked him to get his "Big Chief notebook" for a meeting. Drury also said that another worker, Jesus "Nacho" Quintero, a friend of Abbott, had described Indians working in BNSF's Southwest division as "lazy and a bunch of drunks, or something ... along those lines."

In September of 2006, Drury was interviewed by HR personnel in connection with an age discrimination claim filed by one of the TTC employees. During this interview, Drury told the HR representatives he believed Abbott was biased against older workers and Native Americans.

Calvin Hobbs, BNSF Assistant Vice-President and Abbott's supervisor, later conducted a meeting about the Abbott matter in which he indicated that HR had forwarded "exact quotes" of the interviewees. According to Drury, HR had assured him that his discussion of Abbott's conduct would be kept confidential, and he became concerned that he might be the subject of retaliation by Abbott.

Drury contends that after he expressed his concerns about discrimination, Abbott retaliated by issuing Drury an unsatisfactory performance evaluation, with an overall rating of "needs improvement," prompting Drury to voice additional concerns to management officials and to appeal the performance rating.[2]

Specifically, on or about January 17, 2007, Drury met with Calvin Hobbs to discuss his concerns. Hobbs "acknowledged that [another manager] had [also] expressed his

---

[2] BNSF evaluates exempt employees twice per year, assigning performance ratings ranging from "needs improvement" to "on target," "exceeds target," and "far exceeds target."

concerns about the seeming improprieties with the PMP process as conducted by Jeffrey and the indications of retaliation against the BNSF staff." HR Manager Dane Freshour forwarded Drury's concerns about retaliation to Carl Ice (then Chief Operating Officer, now CEO), Steve Klug (then and now Assistant Vice President of Human Resources for Operations), John Shook (then Director of Human Resources) and Mark Schulze (then and now Vice President of Operations and Safety). Klug is Assistant Vice-President of Human Resources for the Operations Department of BNSF, a position he has held since approximately 1997 or 1998, and he was the top HR decision maker involved with Plaintiff from the time of his initial complaints of discrimination in 2006-2007 until his demotion in 2011 and his termination in January 2012.[3]

Freshour wrote that "we ought to intervene in this year['s] [PMP] process."

One of the persons whose performance rating was reduced was Ricky Bell. Bell complained to HR that he felt Abbott was retaliating against him because he "answered the [HR] questions [about Abbott] honestly."

Shortly afterwards, Abbott met with Drury about his year-end PMP. Abbott did not give Drury a copy of the written review, but "wanted to read the PMP to [Plaintiff]." In contrast to his mid-year review, the new review rated Drury as needing improvement in 4 out of 5 major areas, and placed Drury on a performance improvement plan (PIP) Abbott rated Drury as needing improvement in the two critical officer performance benchmarks of Leadership and on the Overall rating—in the BNSF vernacular, this is called "NI/NI" and is often the death knell for an employee's career at BNSF.

Drury told Abbott that he believed this improper rating was retaliation against him for his complaints, and that Abbott's "derogatory comments about American Indians, older

---

[3] BNSF objects to the plaintiff's detailed history (Fact ¶¶ 108-28) of the 2006-07 Abbott complaint because it is irrelevant, being remote in time to the 2012 termination. (Dkt. 57 at 66). But this information directly responds to a fact (¶ 13) set forth in BNSF's own statement.

workers and now this situation should be intolerable in any work location."

On January 19, 2007, Drury spoke with Hobbs to discuss whether the negative PMP rating was made in retaliation. Hobbs told Drury that he should start looking for another job, because "the senior executives of the BNSF are much younger than [Drury] and will be around longer than [Drury]."

The next day, January 20, 2007, Drury filed a formal written appeal of this performance rating and sent it to HR. Drury described in great detail his concerns about Abbott's discrimination and the retaliation against him. He wrote that Abbott discriminated against Native Americans, making "racial slurs directed at [Plaintiff's] heritage"—including comments such as "get your Big Chief tablet and come in here." Drury also reported concerns about other managers referring to Native American railroad workers in his presence as "Drunken Indians" and expressed that this contributed to a hostile and discriminatory environment at the TTC.

During February, 2007, BNSF removed Abbott from his management position. Schulze responded to Drury's appeal, stating that Drury's overall performance rating had been changed from "needs improvement" to "on target." He added that Drury's rating in the area of leadership remained a "needs improvement," and wrote that he had instructed Drury's new supervisor, Calvin Hobbs, to prepare a Performance Improvement Plan ("PIP") for Drury.

However, Schulze also wrote that Drury had "demonstrated multiple actions that have been detrimental to the TTC mission" including "not demonstrating support for leadership positions with which you may not personally agree." Therefore, Schulze concluded, Drury would still be rated as Needs Improvement in Leadership, and he would be placed on a PIP.

According to Drury, Klug told him that he needed to change his ways or he would be fired and threateningly told him that your "future is in your hands now."

Drury told Hobbs and Klug the continued NI Leadership rating and the alleged lack of "support" reflected continuing retaliation and discrimination. The same day, Drury sent a supplemental letter to the EEOC detailing this meeting with Klug and Hobbs and his ongoing concerns.

On March 12, 2007, Hobbs gave Drury a PIP. After determining that all suggested actions or goals for performance improvement were in fact already accomplished, Drury emailed John Shook in HR, raising his complaint that the PIP was further retaliation against him. Drury wrote that he would "be happy to sit down and show you the inconsistencies, mistakes, and falsehoods that are present within this PIP."

On March 14, 2007, Drury emailed Carl Ice, then Chief Operating Officer of BNSF, currently the CEO, complaining that the Schulze letter and PIP constituted illegal retaliation against him in violation of the law and BNSF policies. He stated he "would be surprised if the BNSF legal department had any input into either the PIP, or Mr. Schulze['s] letter to [Plaintiff] given the inflammatory nature of each." He also wrote that "instead of congratulating me for having the courage to follow the BNSF Code of Conduct and bring these unethical and illegal practices to light, I am now being persecuted for following the ethical and legal course of action."

Later that day, Shook called Drury at Ice's direction. According to Drury, Shook was dismissive and sarcastic about Drury's complaints. In contrast, Ice wrote to Drury on March 14, stating he was "aware of the situation" and "we certainly have taken and will take your concerns seriously."

Shook wrote to Ice that "Mike's behavior has crossed the line: he is very combative, arrogant and his compliance with Calvin's instructions is malicious at best."

Ice responded to Shook that same day, March 14, 2007, and stated "given your comment that he has crossed the line and his reluctance to or refusal to work to improve

I think we get input [from] legal team and decide our next steps."

Shook then wrote to Schulze, stating, "I could not believe how insolent and defiant Mike was. He stated he was merely standing on principle, and even compared himself and the situation to Rosa Parks . . . can you believe it? . . . Per Carl's instructions I'm working with the folks in legal."

In March, 2007, Drury filed a Charge of Discrimination alleging retaliation. Although he received a right-to-sue letter regarding the 2007 Charge, he does not recall filing suit within 90 days of receipt.

On March 31, 2007, Klug emailed Shook that Ice "wants us to close out/respond to Drury—providing we have not done so already."

According to Drury, he experienced additional acts of retaliation during this time. He states that he was excluded from a Senior Manager's event at a Royals game, and that he heard a manager (he does not identify the manager by name) as laughing outside his office door, "HA . . .sounds like an Injun."

Drury reported these events to BNSF HR.

On the morning of April 10, 2007, Hobbs told Drury that he was doing everything correctly in his current performance, and had been doing so prior to any PIP. He was unable to give any examples of any failure to meet performance standards on his part. According to Drury, Hobbs told him that BNSF leadership would "come after [him] and get [him] eventually" in retaliation for his complaints of discrimination — it would just be a matter of time, perhaps months or years before they acted.

Later the same day, Shook emailed Drury, with copies to Klug, Schulze and Hobbs, stating that he had "found no evidence" to support Drury's allegations, and that the "PMP and PIP were completed and conducted in accordance with established policies."

Drury responded that Shook had "not gathered all the facts before responding to his

concerns" and related his conversation with Hobbs.

Drury received no response to his email. Shook later wrote another HR manager, "Be careful if you deal with Drury. He comes equipped with a tape recorder and a combative, confrontational attitude that wears you out. In my opinion he needs to be gone, but by filing the EEOC charge for retaliation, he pretty much limited our options, at least for the near term."

In his deposition in this matter, Steve Klug described Shook's email as "unfortunate" because he does not think Shook as a Human Resources Director for BNSF "needed . . . to express his opinion in writing to Bob like that."

In August 2007, BNSF selected an outside hire, Scott Schafer, to replace Abbott as the new general director of the TTC. Schafer is roughly the same age as Drury. Schafer issued Drury his year-end evaluation for 2007, and Drury received a rating of "on target."

Schafer also evaluated Drury on both a mid-year and year-end basis in 2008 and 2009, and gave him overall ratings of "on target" in all four evaluations. In Drury's 2010 mid-year evaluation, which was also completed by Schafer, Drury received a rating of "needs improvement" in the area of leadership, with the primary issues involving his handling of reporting expenses, but an overall rating of "on target."

In approximately July, 2010, BNSF brought in Lynne Joplin, who is also approximately the same age as Drury, as a director at the TTC. Drury began reporting to Joplin.

Joplin had never met Drury before, and did not know anything about him before meeting him sometime during the first few days of her assignment.

In November 2010, Drury reported that one of his subordinates, Larry Ligman, had used BNSF capital funds to purchase promotional items for use in connection with his personal business and website.  This fraud was perpetrated by Ligman, along with Mark Motley and Jeff Kellogg, through the use of an incorrect "AFE" (a capital account) to

disguise the purchase of promotional products for their personal use. Drury reported his discovery, along with his understanding that a failure to detect the fraud could cause BNSF to violate federal law because its tax returns would be inaccurate. Drury told the fraud investigators of his additional belief, based on his work in the Signal Department, that it was not unusual for employees to use an authorized vendor to purchase from an unauthorized vendor and then rebill it to BNSF with the second vendor's markup.

Ligman acknowledged his wrongdoing, and BNSF terminated his employment as a result. Motley and Kellogg received warning notices and given "needs improvement" warnings.

Following the Ligman incident and a corresponding audit affecting numerous BNSF departments, department managers were required to "restate expenses" because items had been charged to capital funds that should have been charged to operating funds. Drury contends this "made a lot of people look bad," including Schafer; his boss, Mark Schulze; and the Assistant Vice President of Signal, Jim LeVere. The reclassifications caused some departments to operate at a loss in 2011.

The initial fraud investigation report was provided to BNSF executives who were aware of Drury's prior complaints of discrimination and retaliation, including Mark Schulze, Steve Klug, and Scott Schafer.

Drury acknowledged in his deposition that the individuals he contends were made to "look bad" never indicated to him that they were upset. Joplin believed Drury acted appropriately, and in fact commended him in his performance review for doing so. In his response to BNSF's summary judgment motion, Drury acknowledges these individuals did not "directly" express displeasure, but he states there were some "negative statements made about his reporting." Drury states he cannot remember the exact statements, and gives no indication of who made them.

In Drury's 2010 year-end performance evaluation, which was completed by Joplin in early 2011, the ranking in the leadership category moved up from "needs improvement" to "on target," indicating Drury successfully completed the PIP.

Drury's overall rating in the 2010 year-end evaluation was also "on target," a rating with which Schafer agreed.

After Ligman's termination, Motley and Kellogg began reporting directly to Drury early in 2011. Drury had a number of coaching conversations with them about their performance. He spoke of these conversations to Joplin, who told him that Kellogg might well have been fired for his role in the fraud, and that Motley "didn't know his place" and was often making "off-key remarks in front of superiors."

Drury received a negative mid-2011 review. The parties dispute the circumstances leading to that conclusion. BNSF notes evidence indicating that in preparing the 2011 mid-year evaluation, Joplin sought feedback by emailing two of his TTC "customers," Jim LeVere of the Signal Department and Gregory Britz of the telecom department. Both LeVere and Britz expressed concerns about Drury's performance, indicating they were dissatisfied with Drury's service to his customers, observing among other items that Drury showed little innovation in modifying and updating training programs to better suit employees. After reviewing the responses, Joplin gave Drury a "needs improvement" rating in the area of leadership. She wrote that Drury had failed to identify his own professional development goals, had incorrectly instructed an employee to charge operating expenses to capital expenses, and had strained relationships with subordinates. In addition, with regard to training for a Positive Train Control (PTC) initiative, Joplin wrote that six weeks before a deadline, Drury had not scheduled any project meetings, had failed to hold regular conference calls, and had not embraced responsibilities as project manager. Joplin gave Drury an overall rating of "needs improvement."

Drury acknowledges Joplin's rating, but states that Jim LeVere "improperly

coerced" her. He also disputes the factual basis for Joplin's rating, stating that he was not behind on any projects. Drury further states that LeVere had no factual basis for any criticism, and that his email response to Joplin, which stated that Drury needs "updating to adjust to the type of learning that suits the next generation of employees," suggests a discriminatory animus against older workers. He makes the same argument with respect to the reply by Gregory Britz, which stated that Drury can be "very regimented," had a "strong personality" and a "rigid outlook," and "gives the impression that change is difficult."

With no evidentiary support, Drury claims that these traits suggest an anti-Native American animus. No evidence supports the assertion that LeVere somehow "coerced" Joplin in her assessment of Drury.

Drury notes that the 2011 mid-year review was based in part on complaints from Motley and Kellogg about his coaching. He states that Joplin never told him of their complaints prior to the negative review, and she indicated to him that "they were lucky they were not fired as a result of the fraud investigation." Plaintiff stated that, despite the bias implicit in the source of such complaints, BNSF did not investigate Motley or Kellogg's comments, but simply took them at face value.

Drury states that Schafer and Joplin created a performance timeline which falsely painted a pattern of poor performance by him, by selectively relying on adverse comments in his record going back to 2008. Schafer undertook the creation of the

timeline after Wisman and Klug declined to remove Drury from his position. It is not clear exactly when the timeline was created, although a draft was sent to Joplin on August 2, 2011.

Although BNSF acknowledges that the timeline was created, it disputes the

conclusion that the timeline reflects anything other than the honest beliefs of its authors. The timeline indicates, in connection with the audit following the Ligman fraud, that Drury was "the biggest offender." Drury has acknowledged that he also made errors in the correct allocation of expenses, but it is unclear that he was indeed the "biggest offender."

Schafer told LeVere in February, 2011 that "I think he is desperate to leave the TTC with the pressure he has been under from the Telecom fiasco. . . and he is not doing well in his position."

When LeVere stated he had "not heard about the Telecomm deal," Schafer wrote: "Telecom story: One of Michael's direct reports was let go from the company in December for falsifying invoices and receiving [promotional items] under the guise of telecom parts. Michael was the one to identify it [sic] the issue. However, in the following audit, many of his invoices have come under scrutiny (using Capital AFEs to pay for Operating Expenses)."

Drury infers from this that Schafer was suggesting to LeVere that Drury was the "target" of the fraud audit, but this term does not appear in their communications. Rather, Schafer appears simply to be mentioning the existence of the admittedly incorrect allocation of expenditures made by Drury. The communications record does show that BNSF management received numerous complaints by Kellogg and Motley about Drury. Drury disputes the accuracy of these complaints, as well as other comments about his inadequate leadership placed on the timeline.

According to Drury, Joplin falsely testified that she received the timeline in March or April of 2011, and began entering her comments about the same time. However, there is also evidence that Joplin continued to work on the timeline in August of 2011, after she received a draft timeline from Schafer. Drury states that, as late as June 14, 2011, Joplin apparently felt positively enough about Drury to note his interest in a Kansas City Signal Department position. This overstates what Joplin actually wrote. After noting Drury's

15

interest, she wrote: "Not sure if Michael would be seen as a candidate or not."

Joplin testified that she met with LeVere in Minneapolis in mid-July. He told her "he wanted Mr. Drury to be rated as NI." Such a request by a non-supervisor was unusual enough that Joplin felt it was "quite out of line," and she reported it to HR.

After this meeting, Joplin solicited the reactions of Carol Kozloski and Greg Britz. LeVere wonder if Drury was "innovative" enough for "the next generation of employees." Britz offered positive and negative comments. He wrote that Drury "has strong planning skills and thinks 6 months or more ahead of the schedule."   He also wrote that Drury "seems very regimented in his approach to the Managers job," but that "[t]his can be good when trying to manage an unfocused organization." He noted that Motley and Kellogg seemed "very frustrated with him during private conversations," which might be to due to "his strong personality."

Kozloski wrote to Joplin that she was not close enough to judge the plaintiff. According to Drury, this indicates that Schafer was false in his testimony that Kozloski gave negative feedback to him prior to the review. However, while Kozloski may not have personally witnessed Drury's management skills, this does not mean she was unable to forward to Joplin what BNSF's internal customers were reporting, and Kozloski testified she did orally communicate with Joplin.

LeVere admitted in his deposition that he had no specific factual basis for any complaints about Drury. Nevertheless, LeVere emailed Joplin that Drury "has no hope of a management position with Signal."

On August 9, 2011, Joplin emailed Wisman and  Schafer with the marked-up timeline as "supporting documentation for Michael's performance" Drury alleges that in this email, Joplin also included a copy of Britz's email, which she altered to falsely indicate that Drury was "[not] agreeable" to requests for remote training. The email noted that

16

Drury had received a "Needs Improvement" rating in 2006, without noting that Drury had successfully appealed the rating, which was changed to "On Target Overall."

Eric Wisman explained that Mark Schulze was probably involved in the discussions and decision to demote Plaintiff, since he was Scott Schafer's supervisor and "had management oversight for the TTC" at that time. Steve Klug of HR also was involved and was required to approve the demotion.

Joplin's email states that Drury was "very regimented," that internal BNSF customers indicated "unanimous negative feedback" and "overwhelming dissatisfaction" with him, that he was "initially unreceptive to Telecom's need for [remote] training," and that he appeared "arrogant and condescending" to his workers. Drury disputes each of these conclusions, suggests that Joplin lied about receiving oral feedback from Kozloski, and argues the workers involved (Kellogg and Motley) were biased against him following the Ligman fraud investigation. He notes that, aside from these subjective impressions, the report acknowledged that he was doing well by every objective measure.

LeVere acknowledged that he could not identify any specific performance problem or other than satisfactory result with Drury's work in the TTC. Ralph Young, the General Director of Signal Engineering, who reports directly to LeVere, testified that he "did not have any problems with [Drury]."

Plaintiff also notes a discrepancy between the testimony of Joplin and that of LeVere. LeVere testified he "wasn't involved in [Drury's] midyear performance review," and that he did not "ask or instruct Lynne Joplin to rate Mr. Drury as NI/NI at the midyear 2011 review."

BNSF notes that, prior to his placement on the PIP, Drury had repeatedly told Schafer and Joplin that he wanted to find a position outside the TTC. Drury avers that he made such applications because he believed he was being blackballed within that department. It is uncontroverted that during this period Drury applied for other BNSF

17

positions, at least 100 and perhaps as many as 130. He claims he was given only two cursory interviews, and that the jobs went to other, less qualified candidates. However, as BNSF accurately notes, Drury gives no specific information about the jobs in question which would allow the court to determine if the situations are comparable. Further, Drury has expressly disavowed any claim for failure to hire or failure to promote claim regarding any of these applications, almost all of which fall outside the applicable limitation period.

Instead, Drury cites the additional applications as evidence of retaliatory intent, and the mechanism by which his prior EEOC charge became widely known within BNSF. As noted earlier, Schafer testified that he understood the EEOC charge related to "his [Drury's] Native American Heritage," and that this charge "was common knowledge" at BNSF. Schafer gave other managers access to Drury's records.

In particular, Drury cites an email exchange among BNSF managers in 2009. When LeVere sought input about Drury, Klug responded that "we had him rated as an NI year before last and wound up changing the rating when we realized that his supervisor (Jeff Abbott – who was terminated) did not do a good job documenting his performance." He also wrote that, ""Since that time, I am told, Michael has seen the light and his performance has been good."

Drury claims this was false, but the evidence is consistent with Klug's comment — Drury received a NI rating which was later rescinded, and Drury's overall job performance evaluations returned to their previous fully on target status for his 2007, 2008, 2009 and 2010 year end evaluations.

LeVere responded the same day: "That doesn't square with Scott's desire to have him move out of the role. They see him as arrogant. Many of the signal managers do too. I'd like to know how that has been addressed, as well as other issues, in formal manner via the PMP process."

Klug then responded that he believed that Drury "has been getting the job done."

However, he also wrote that he "had a conversation with him when we altered his rating and told him he would get fired if he didn't change his ways. I thought he has been getting the job done, but you witnessed his bullheadedness in our earlier debate over the pre-employment testing tool for signal ETs. He needs to be out of the tech trng center."

After this, Drury was not interviewed or further considered for any voluntary transfer or promotion into the Signal organization. even though his performance reviews were overall On Target. On September 28, 2009, LeVere wrote that Drury's application for promotion was "pretty forward of him!", and asked Schafer "have you had any discussion regarding our belief that he needs to red circle back to a grade 30 general construction supervisor?" Schafer responded that he had not discussed such a demotion with Drury.

Drury alleges that, contrary to BNSF policy, he was "pre-screened" and not even considered for the numerous jobs he applied for. However, Drury provides no specific evidence in support of such a "pre-screening" policy, or that he was not "considered" for these jobs.

In January 2009, Drury received an anonymous letter in his BNSF mailbox, stating "Watch your back, they are coming after you again." Drury took the letter to Schafer, stated that he took it as a threat, and commented "I'm afraid the retaliation is happening again." Schafer said he would report the letter to Klug, and gave it to BNSF's internal security officers. Drury asserts that BNSF made no investigation of the letter, but the evidence simply shows that Klug did not personally know of any investigation. The evidence is unclear whether BNSF security officers investigated, and in any event it is unclear, given the unsigned, anonymous nature of the letter, that any investigation would have been productive. It is uncontroverted that no one from BNSF followed up with Schafer about the letter.

A few days later, on January 23, 2009, a Hotline call was placed anonymously to BNSF, stating that Drury was personally involved with a BNSF contractor. Schafer

19

conducted a limited investigation and concluded that Drury was in a "mutually agreeable relationship" with a BNSF contractor and that "they work in separate areas and do not have routine interaction during the business day." Therefore, Mr. Schafer in consultation with HR, concluded that they "believe there to be no credibility in the claim of sexual harassment or inappropriate behavior on BNSF property" and "that [Plaintiff's relationship] did not violate BNSF policy."

Again, HR did not investigate the telephone call, even though Abbott was suspected. BNSF correctly notes that Abbott was removed from his managerial position, and was not involved in Drury's termination. (Dkt. 57, at 93)

According to Drury, in late August or very early September, Joplin met with him and told him he had two options—to take a demotion to a non-management Signal position in LeVere's Department, or to go on to a PIP. Joplin told Drury the demotion would come with a 10% salary cut at the direction of senior management, in contradiction to BNSF policy which specified only a 5% cut, and a bonus reduction, but that he would be given a clean start and that he would not be placed on any PIP if he elected the demotion option.

In late August 2011, Joplin issued Drury a 90-day PIP, setting out six areas in which he needed to improve. She testified in her deposition that she issued the Plan in an effort to help him be successful. Joplin testified that, although she did learn at some point that Drury was an American Indian, she  did not know that he had previously filed an EEOC Charge against BNSF.

Drury reviewed the proposed PIP, and felt that because it relied so heavily on subjective assessments, it seemed designed to terminate him. Drury claims that he told Joplin he believed the true motivation for the PIP was to fire him, and Joplin "just looked at me and nodded her head yes."

As BNSF notes, Joplin adamantly denies making any such representation to Drury. It also contends that Drury is relying on a "vague reference to a non-verbal gesture [and

not] anything Joplin actually said." Also, it essentially asks, why Joplin or LeVere would be working to fire Drury when they were instead attempting to move him to another department.

But if Drury was moved to another department, it was as a demotion. More importantly, whether verbal or not, there is nothing vague in a nod of the head to a yes or no question. Drury's testimony is directly contrary to Joplin's. At this stage, the court must accept as true that Joplin acknowledged that the true purpose of the PIP was to obtain Drury's termination.

On August 31, 2011, LeVere sent an email proposing Drury's demotion to Sam Sexhus, his supervisor. Sexhus responded, "Doesn't ring a bell—who is he and what did he do." After LeVere identified Drury as Senior Manager of Signal and Telecom training, Sexhus asked, "Ah. Wasn't he involved in some sort of dishonesty or something corp audit got into [?]" LeVere replied: "Yeah, I think he had some expense account exploitation."

On October 3, 2011, Drury was involuntarily demoted to Engineer Interlocking Systems (EIS) in the LeVere's Signal Department. He reported directly to Dwight Golder. Golder reported to Ralph Young, who reported to LeVere.

LeVere testified that Drury was moved to the new position, "in order to reset the deck and give Michael a new chance to . . . learn new skills" and "start his career in a different direction." And, because Drury "didn't really have a background in signal engineering, ... we were going to bring him over into signal engineering and work on a new skill set, working with different people, different processes." The EIS position was a salaried exempt position, and paid ten percent less than that of his previous job, thereby decreasing the amount of any potential bonus as well.

Drury is not aware of and has not identified any statements or behaviors by Schafer or Joplin that reflected an inappropriate stereotype or any discriminatory animus specifically against Native Americans. According to Drury, he once heard Schafer state

that, when he was in the military in the Philippines, he had visited "brown bunnies," which he understood to mean young prostitutes. Drury states that he found "such terminology offensive to all racial minorities, including Native Americans."

Drury testified that he never heard Golder, Gerstner, Young, or LeVere make any comments that were age-related or that indicated any animus specifically against Native Americans or Seminoles.

Drury has testified that in one conversation Golder referred to an Asian employee as "Taiwanese, Vietnamese, Chinese or some ese, you know a slant." Golder (according to Drury) then performed a racist impression of an Asian person "squinting his eyes" and speaking with an accent "like a bad Charlie Chan movie" and laughing about firing him. Golder was previously disciplined for his treatment of a black worker.

LeVere testified that he did not know about BNSF's 2007 EEOC complaint, or the plaintiff's ancestry. Golder and Gernster testified similarly. Drury asserts this is false, and has testified that LeVere mentioned the complaint in a conversation prior to his demotion from the TTC position.  BNSF disputes this assertion, stresses that LeVere has denied any knowledge of Drury's race, and notes that Drury was unable to remember exactly when the alleged conversation occurred.

LeVere further testified that Plaintiff was not supposed to be on a PIP in his new position, and that his year end 2011 review was supposed to be based solely on his performance in his new position, and not on his prior work in the TTC. Gerstner testified that Drury was also supposed to receive training on how to do his new job and that training would be a process taking many weeks or months to become fully trained.[4] Drury did not receive any substantial training.

---

[4] BNSF disputes this last point, observing that Drury had prior training as a signal supervisor, but for purposes of summary judgment, the court accepts Gerstner's deposition testimony, as well as that of LeVere, who acknowledged that Drury "had never [performed the] positions" in the engineering office previously.

Drury was not given any written job description, but Golder did orally discuss his responsibilities. There is a fact dispute as to whether Drury was given any negative feedback about his job performance in the new position. Drury says he was not, and that to the extent Golder did discuss his performance, it was in reference to the "extremely negative review" given earlier for Drury's TTC work, and that "you should not have complained so much." Golder has testified that he did discuss Drury's Signal Engineering Department performance with him.

As with the issue of whether LeVere knew of the 2007 EEOC complaint, BNSF stresses Golder's testimony that he did not know of the complaint and did not know of Drury's ancestry.

In an affidavit, Drury now states that he discussed his career goals with Golder in October or November of 2011, explaining that his longer term plan was to get back out to the field as Manager of Signals, and in the process to be a good role model and representative for all American Indian employees on the railroad. BNSF notes that this assertion directly controverts Drury's admission in his deposition that he never told any person of his Native American status.

In the 2011 year-end review, Golder rated Drury as needing improvement overall, and in several specific areas. In these areas, the review references Drury's TTC work, which was not supposed to form a part of the evaluation. Golder admits he did not have "any complaints about Mr. Drury's work from anybody else that was working with the engineering office," and that he did not give any performance feedback to Drury, as he was "put on hold" by Gerstner in terms of giving Plaintiff his written PMP feedback. Afterwards, the PMP was never given to Drury, and Golder never warned Drury at any point even up to and including the day he was fired. "[I]n terms of any of [his] verbal discussions" with Drury, Golder never "gave him a warning," told him "your job is at risk, you need to do this or you're going to get fired, or anything like that." Having received no

23

contrary instruction, Golder reviewed Drury based on his TTC work.

Golder forwarded the review to Gerstner, who turn forwarded it to Young (who is 51 years old) for discussion with LeVere.

Gerstner did not "personally put any comments or text" in the review, and he was not "aware of it being revised in any way." Neither Golder, Gerstner, nor Young recommended termination. Golder testified he spoke with Gerstner and Young about Drury, but there was no discussion of terminating him.

In the event of extraordinary acts of misconduct such as violence, fraud, or misappropriation of company funds, BNSF will immediately terminate an employee. Otherwise, the company policy is to first place an individual on a PIP. According to LeVere, "if somebody is rated NI [Needs Improvement], there ought to be some type of coaching or counseling provided to the employee on how to improve that rating."

However, it is not clear that the preference for a PIP is universally applied. There is evidence that in the present case BNSF felt no additional PIP needed to be in place because the conduct described in the latest review simply reflected a continuation of the inadequate performance documented in the PIP instituted while Drury was at TTC.    On January 5, 2012, LeVere emailed Gerstner directing him to

> prepare a short narrative outlining Michael Drury's performance and our desire to [terminate him]. Much of what you need is well documented in his PMP by Dwight Golder. Dwight has done an outstanding job of documenting the performance behaviors and failures.

LeVere sent copies of the email to Sexhus, Klug, and Young. Notwithstanding the email's reference to "our desire," Gerstner testified that this email was "the first [he'd] heard of that" possibility.

LeVere acknowledged that he did not study the review sufficiently to see that the PMP was largely based on the TTC work, not the two months Drury was in the Signal Engineering Department.

Gerstner wrote a memo stating that Drury had a "negative attitude" in his new position. Gerstner and Young acknowledged in his depositions that they had no direct knowledge of Drury's job performance. LeVere then forwarded this memo to Sexhus and Klug, asking whether he should give the PMP to Drury prior to his termination.

According to BNSF, Drury received no additional coaching because the problem was not a lack of training but behavior. Specifically, according to LeVere, he understood that Drury exhibited not being helpful, "exhibit[ing] the same sorts of behaviors of not wanting to be customer centric that he had ... exhibited" prior to the TTC PIP. LeVere had no personal knowledge of such behavior, but relied on Klug (who knew both the Signal Training and Signal Engineering Divisions) to make the decision regarding termination. Klug handled the conversations with Sexhus and Greg Fox.

Klug testified that the decision to fire Drury some two months after moving him to the new position raised some possible "red flags," but undertook no additional investigation other than reading the PMP. He testified that he understood Golder and Gerstner wanted to fire Drury, and did not know that they "had no idea that [Drury] was going to be removed from his position in the signal department until they were told that by Mr. LeVere."

Golder learned of the termination only a few moments before its implementation on January 25, 2012. He "was notified by [Gerstner] to bring Mr. Drury up to the conference room, and the decision had been made to terminate him." At the meeting, Gerstner, Golder and a local HR Representative Tamala Cleaver gave Drury a letter terminating his employment.

Drury was never given a copy of the year-end 2011 review, or any other negative feedback about his job performance. Gerstner then met with LeVere and Ralph Young and told them that Drury had been fired.

Gerstner has testified that Drury's termination was "really unusual." He and Young

25

testified that they had never seen an exempt employee terminated who had been on the job for only two or three months.

BNSF admits that at least since 2007, no other exempt employee with less than four months service in a position in the TTC or Signal department in Kansas has been terminated for unsatisfactory performance.

According to LeVere, while Drury was terminated from his exempt managerial position, he was eligible to remain at BNSF as a scheduled employee. Drury subsequently learned, however, that he was ineligible to return to a non-exempt craft position because he had not paid his union dues during his salaried tenure. His last day of employment with BNSF was therefore January 25, 2012.

Between 2007 and his termination, Drury made no reports of discrimination or retaliation.

BNSF's motion addresses several specific positions which Drury applied for while at the railroad, and notes that Drury has no specific knowledge of the backgrounds or qualifications of the candidates who got those jobs.

Less than a month after his termination, Drury filed a charge of discrimination and retaliation as well as whistle-blower retaliation with the EEOC. The February 22, 2012 filing alleged a pattern of discrimination and retaliation against him from January 2007 up to the termination. On March 13, 2013, the EEOC mailed Plaintiff a Notice of Right to Sue. Drury filed this lawsuit on June 11, 2013.

*Conclusions of Law*

*1. National Origin and Race*

BNSF seeks dismissal of Drury's claim of discrimination based on national origin or race on two grounds. First, it argues that none of the managers involved in Drury's 2012 termination (Golder, Gerstner, Young, and LeVere) was even aware of the plaintiff's

26

ancestry. Second, BNSF contends that even if they were aware of that fact, there is no evidence of a discriminatory animus on their part.

The court finds that factual questions do not preclude summary judgment based on the alleged lack of plaintiff's ancestry among BNSF managers.

As BNSF notes, each of the 2012 decision-makers denies any knowledge of plaintiff's ancestry. BNSF further argues, persuasively, that Drury's eleventh hour assertion by affidavit that he spoke with Golder about his ancestry should be dismissed as a sham. The contention (Affidavit, ¶¶ 19-23, 105) is directly contrary to his earlier deposition testimony that he did not speak about his ancestry with Golder.

> Sham affidavits, though "unusual," arise when a witness submits an affidavit that contradicts the witness's prior testimony. *Law Co. v. Mohawk Const. & Supply Co.*, 577 F.3d 1164, 1169 (10th Cir.2009). Although "[a]n affidavit may not be disregarded solely because it conflicts with the affiant's prior sworn statements," we may nonetheless disregard a conflicting affidavit if it "constitutes an attempt to create a sham fact issue." *Id.* (quotations omitted). "In determining whether an affidavit creates a sham fact issue, we consider whether: '(1) the affiant was cross-examined during his earlier testimony; (2) the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence; and (3) the earlier testimony reflects confusion which the affidavit attempts to explain.' " *Id.* (quoting *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 973 (10th Cir.2001)).

*Knitter v. Corvias Military Living*, 758 F.3d 1214, 1218 n. 3 (10th Cir. 2014).

Here the affidavit directly contradicts plaintiff's earlier testimony. This testimony occurred in the presence of plaintiff's counsel, who was able to further the develop the record at the time, had he chosen to do so. The affidavit testimony does not attempt to explain the earlier deposition, and Drury exhibited no confusion during his deposition. To the contrary, immediately after disavowing having any direct conversation with Golder about his Native American ancestry and indicating that he had never heard Golder say anything negative about Native Americans, Drury proceeded to testify in detail about an incident in which Golder allegedly expressed ill feelings toward Asians.

It simply defies belief that Drury — who after all immediately recorded and

energetically reported his complaints in 2007 with respect to Abbott's discriminatory comments,  and was able to describe in detail supposed comments by Golder against Asians — simply forgot about such anti-Native American comments by Golder during his deposition.

However, even dismissing the assertions with respect to Golder, the court finds that there is evidence from which a trier of fact could infer that the 2012 decision makers knew, or possibly knew, of Drury's ancestry. Drury directly alleges that Gerstner knew of his ancestry from working together in Kansas City. He alleges that he directly told Young and LeVere of his ancestry and concerns about BNSF's treatment of Native Americans. Schafer, Joplin and Klug may also had input in the 2012 decision, and they clearly knew. Of course, merely because Drury was involved in Native American issues, and had Native American interests, does not automatically translate into knowledge of Native American ancestry. And simply because information about that ancestry was separately available in Drury's personnel file does not mean that any decision-maker actually accessed the information.

However, even assuming the decision makers did in fact know of plaintiff's ancestry, the plaintiff still has failed to show that anti-Native American animus played any role in his termination.

Drury claims four comments indicate an anti-Indian animus – Abbott's instruction, prior to a meeting, that Drury should "Get your Big Chief tablet," (2) a statement by Abbott's friend, Jesus Quintero, that many of BNSF workers were "Drunken

Indians,"(3) an incident in which someone laughed outside his office door, "Ha, sounds like an Injun," (4) and  an additional  comment by Golder about Indian rail gangs being worthless.

As noted earlier, BNSF terminated Abbott five years before Drury's 2012 termination. Quintero was not a supervisor of Drury, but one of his coworkers. Plaintiff's

response does not directly describe the circumstances of the "sounds like an Injun" comment, other than that it was made outside his office in early 2007 (Dkt. 54, at 60), and that it was made by either Abbott or Quintero (*id.*, at 113).

Thus, only the comment made by a 2012 decision maker, and the only one reflecting an anti-Native American animus within the half decade preceding Drury's termination, was the comment attributed to Golder. However, as noted earlier, Drury's affidavit assertion as to Golder is directly contrary to his deposition testimony. The court finds that testimony is properly disregarded.

In the absence of any evidence of anti-Native American animus among the 2012 decision-makers, Drury falls back on assertions that some mangers had expressed negative sentiments against other minorities. In one instance, a manager referred to visiting "brown bunnies" in the Philippines, which Drury understood to mean prostitutes. On another occasion, he alleges that Golder referred to an Asian person as a "slant."

The plaintiff has supplied no authority for the proposition that animus is somehow fungible, such that comments against other minorities *standing alone* creates an inference of animus against all minorities, or against another separate minority protected class to which the plaintiff belonged. Further, the two incidents appear to be stray comments advanced during Drury's lengthy employment with BNSF, and the court finds no basis for concluding that anti-Native American animus underlies the defendant's actions as to Drury's employment. *See Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994).

## 2. Retaliation

The parties do not dispute the basic framework under which the court assesses claim of retaliatory discharge. The plaintiff must show he engaged in protected activity, was subjected to an "adverse employment action," and that "a causal connection existed

between [the] protected activity and the adverse employment action." *McCrary v. Aurora Public Schools*, 57 Fed. Appx. 362, 369-70 (10th Cir. 2003). BNSF centers its argument on the third element, arguing that the evidence fails to give any inference that Drury's 2007 protected conduct caused his termination nearly half a decade later.

In his Response, the plaintiff agrees that, given the delay between his 2006-07 complaints and his ultimate termination, summary judgment would be warranted if he relied solely on an inference from timing. He argues, however, that his case presents direct evidence of retaliatory intent. He notes the observation of the Tenth Circuit in *Marx v. Schnuck Markets, Inc.*, 76 F.3d 324, 329 (10th Cir. 1996) to the effect that "the phrase 'closely followed' must not be read too restrictively where the pattern of retaliatory conduct begins soon after the ... complaint and only culminates later in actual discharge."

The court finds that plaintiff has failed to present evidence which would permit a reasonable inference of causation. The time period between the protected activity here and Drury's termination is extraordinarily long, nearly half a decade. In contrast, in *Marx* the delay was a mere 21 months. The same court otherwise stressed that it had previously "rejected attempts to stretch the 'close temporal proximity' required." 76 F.3d at 329.[5]

Drury claims that BNSF's managers "laid in wait" to spring their retaliatory scheme. He contends that he was subjected to continuing antagonism during the interim period,

_____

[5] The other cases cited by Drury (Dkt. 54 at 128 n. 15) are all from outside the Tenth Circuit and arise with markedly different facts. Thus, for example, plaintiff cites *Porter v. California Dep't of Corrections*, 419 F.3d 885, 895-95 (9th Cir. 2005) as indicating that temporal inferences should not be applied mechanically. In that case, which the plaintiff filed in 2000,  extreme sexual harrassment occurred  in the period of 1995-1996. This later declined but the court specifically found that the conduct of the two perpetrator supervisors "persisted" after 1998, and most importantly, that one of them "was not in a position to retaliate until after he became the Personnel Assignment Sergeant." *Id.* at 894, 895. Here plaintiff essentially alleges a conspiracy throughout BNSF's upper management, in both the TTC and Signals Department. There is no evidence that the supposed conspirators would have been unable to demote or terminate Drury in 2007. Instead, they terminated Abbott (the perpetrator), and approved Drury's appeal of the PIP imposed that year. Drury was then favorably treated for some five years.

and presents a litany of about two dozen incidents in support of this claim. (Dkt. 54, at 130-31). Strikingly, however, almost all of these events happened in 2007, not during the many intervening years when Drury worked at BNSF without complaint. Further, many of the events he cites reflect comments by John Shook of HR. While it is clear that Shook formed a strong negative opinion of Drury as arrogant and inflexible, this occurred in 2007 and there is no evidence at all that Shook was involved in the 2012 decision to terminate Drury. *See Tejada v. Travis Ass'n for the Blind*, No 12-997-DAE, 2014 WL 4165370, *6 (W.D. Tex., Aug. 7, 2014) (granting summary judgment and concluding that plaintiff's claim that supervisor "was lying-in-wait for nearly three years" was "[n]ot only ... farfetched, it borders on the fanciful").

Otherwise, Drury notes that he unsuccessfully submitted many employment applications during this time period, as well as the "watch your back" note he received, and the anonymous hotline report of sexual harassment. But, as to those unsuccessful applications, Drury has not shown any specific comparative information. He has not shown how he was qualified for specific jobs, and has not shown than he was better qualified that the successful candidates.

The "watch your back" note and the hotline tip were both anonymous. While Drury complains that BNSF failed to fully investigate these incidents, given their anonymous nature, there is no reason to suppose an investigation stood a likelihood of success. The hotline tip was investigated, and corroborated, by BNSF in that it determined that Drury was in a personal relationship with a contractor. However, the company determined the relationship was consensual and absolved him of wrongdoing. There is no evidence linking these communications to the decision-makers involved in Drury's termination in 2012. The suspected perpetrator, Abbott, had already been removed from his managerial position by BNSF. Finally, both communications occurred in early 2009, some three years prior to his termination.

Finally, Drury suggests that an inference of causation may arise because the proffered rationale for his termination was pretextual, again presenting bullet-point laundry lists of incidents taken from the evidentiary record. (Dkt. 54 at 120-125). Upon examination, all of the evidence cited by plaintiff simply establishes that by 2011 and 2012, he and BNSF had come to markedly different subjective assessments of his leadership and managerial skills.

Drury attempts to convert relatively minor disagreements in the testimony[6] into evidence of the "laying in wait" conspiracy. BNSF has conceded the process was not perfect — although the plan was for Drury to receive a 2011 year-end review based on only on his work in the Signals Department, he was there for only a few months and his managers apparently utilized some of the information from Drury's work in the TTC Department. However, the court finds no basis for concluding that the Signals Department decision-makers did not genuinely believe that Drury exhibited continuing and irremediable problems in management skills.

While ordinarily BNSF workers are placed on a PIP prior to termination, the uncontroverted evidence otherwise establishes that a PIP was indeed in place for Drury only a few months before at TTC. BNSF reasonably concluded that no additional PIP was necessary under the circumstances of the case.

Drury engaged in protected activity in 2007, reporting harassment by his supervisor Abbott. Abbott was removed and a negative evaluation of Drury was amended. Drury then worked at BNSF for a further five years. During the first four years, he received positive evaluations, suffered no tangible injuries,  and made no complaints of discrimination by

---

[6] For example, exactly when was the Joplin timeline created? And was the 2011 PIP a sincere effort to get Drury to improve or was it understood or expected he would fail to meet its goals? Even assuming Joplin agreed with Drury's suspicion that management expected him to fail to improve his performance in 2012, and thus fail to meet the last PIP, there is still nothing to show this was retaliation for the events five years earlier, rather than a sincere assessment of his substandard performance.

BNSF managers. Moreover, when Drury lost the TTC position, it was LeVere who hired him for the Signals Department. The plaintiff has never articulated any credible rationale for LeVere's actions, other than as a sincere effort to accommodate the plaintiff in light of his understanding of the his skills and circumstances.

### 3. Public Policy

Drury has asserted a claim that his demotion and termination violates Kansas public policy. Specifically, he argues that BNSF fired him because he reported the actions of another employee who been defrauding the company by miscategorizing certain expenses, and using the purchases for his private business. He theorizes that, in the absence of a correction of the expense account records, BNSF might have been in violation of federal or state tax laws. Thus, he argues, he was demoted and terminated in retaliation for his whistleblowing activity. See *Palmer v. Brown*, 242 Kan. 893, 900, 752 P.2d 685 (1988) (discussing elements of claim of discharge in violation of public policy). To support such a claim under Kansas law, a plaintiff must present evidence that is clear and convincing. *Hill v. IBP*, 881 F.Supp.2d 521, 524 (D. Kan. 1995).

The court grants summary judgment as to this claim, because, as with Drury's federal retaliation claim, there is no evidence that the demotion and termination were caused by, or in retaliation for, his earlier actions. The evidence establishes that, far from condemning Drury's report of Ligman's fraud BNSF commended the plaintiff. Notwithstanding Drury's subjective impression that the report, and the ensuing audit, made some BNSF managers "look bad," it is uncontroverted that no one at BNSF expressed negative feelings about his reporting of the fraud.

To the extent that the audit required some departments or managers to rework their reports, this applied to Drury himself. The evidence is uncontroverted that following the

audit, his own expense records were found to be in error. Drury continued to receive positive reviews following the Ligman report. Indeed, BNSF actually took Drury off the PIP that had been put in place prior to the report. Drury was not demoted from the TTC position until some ten months after the Ligman report.

The court finds plaintiff has failed to identify evidence of a clear and convincing nature which would support the conclusion that his demotion or termination was caused by or in retaliation for his report of the Ligman fraud.

IT IS ACCORDINGLY ORDERED this 5th day of January, 2015, that the defendant's Motion for Summary Judgment (Dkt. 47) is hereby granted.

 s/ J. Thomas Marten

J. THOMAS MARTEN, JUDGE